IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) **Civil No. 3:23-CV-123** |
| APPROXIMATELY $7,960.00 IN UNITED | ) |
| STATES CURRENCY SEIZED FROM | ) |
| LAQUAN SAVOY ON OCTOBER 11, 2022, AT | ) |
| THE CHARLOTTE-DOUGLAS | ) |
| INTERNATIONAL AIRPORT | ) |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

**INTRODUCTION**

1. This is a civil action *in rem* against approximately $7,960.00 in United States Currency seized from Laquan Savoy ("Savoy") on October 11, 2022, at the Charlotte-Douglas International Airport ("the Currency"). Savoy maintained the Currency in luggage with marijuana shake and dryer sheets—luggage about which he lied and to which multiple trained and certified narcotics detecting K9 officers alerted. Savoy was previously arrested in the Charlotte-Douglas International Airport and convicted in Mecklenburg County for transporting thirty-nine pounds of marijuana from San Francisco, California, to Charlotte. Further, in the past two years, Savoy, who has no apparent legitimate income, has spent in excess of $17,000 on at least forty-five flights between the East Coast and California, often purchasing tickets at the last minute and with short turnarounds for the trips. His conduct fits the profile of a drug and drug money courier.

2. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## NATURE OF THE ACTION

3. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

4. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

5. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

6. The Currency has been seized and is now within the Western District of North Carolina.

7. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent ("SA") Daniel Leal, this action seeks the forfeiture of all right, title, and interest in the Currency.

# FACTS GIVING RISE TO FORFEITURE

*Prior arrest and charges based on July 29, 2019 conduct*

8. On July 29, 2019, law enforcement encountered Savoy at the Charlotte airport transporting approximately thirty-nine pounds of marijuana from San Francisco, California, to Charlotte. Savoy was ultimately arrested and convicted in Mecklenburg County of felony Possession with Intent to Sell/Deliver Marijuana in Mecklenburg County.

*Savoy's frequent travel in the two years prior to the October 11, 2022 seizure*

9. Savoy's travel history in the approximate two years prior to the October 11, 2022 seizure was consistent with that of a drug or money courier.

10. Specifically, California is and has been a known drug source state for the East Coast. Airline records reveal that, from November 2020 to October 2022 – during the COVID-19 pandemic and after Savoy's arrest for transporting thirty-nine pounds of marijuana through the Charlotte airport - Savoy booked approximately forty-five flights between the East Coast and California, reflecting at least approximately twenty-seven round trips by Savoy (either via flights or some combination of car and air travel).

11. On approximately two occasions, Savoy returned from California after two days there, and on at least one occasion, he returned to California after one day in North Carolina. These short turnaround trips are indicative of drug couriers and money mules.

12. Savoy also purchased many of his airline tickets last minute, spending at least $17,378.00 on airline tickets during this time period, despite the fact that law enforcement has not identified any reported legitimate employment and legitimate source of income for Savoy. This conduct also indicative of a drug courier and/or money mule acting on last minute instructions.

*The October 11, 2022 interdiction and seizure*

13. Among Savoy's many flights was the October 11, 2022 flight at-issue in this case.

14. Specifically, on October 11, 2022, Savoy, who was still on probation on the state conviction related to his July 29, 2019 arrest, was traveling from Charlotte, North Carolina, to San Francisco, California (a known drug-source location) on American Airlines Flight 2651.

15. That day, HSI Task Force Officer ("TFO") Johnathan Cerdan, TFO Kevin Osuch, and SA Leal were conducting an interdiction operation at the Charlotte airport. The interdiction operation included the deployment of K9 Cali, a properly trained and certified narcotics detection canine, to conduct open-air sniffs of checked suitcases on the tarmac prior to their being loaded onto Flight 2651.

16. During the interdiction operation on the tarmac, K9 Cali alerted to a suitcase bearing the name, "Savoy/Laquan."

17. Law enforcement transported the suitcase to the boarding area. Then, law enforcement made consensual contact with and spoke with Savoy at a public area beside Gate C16.

18. At the gate, Savoy granted consent for law enforcement to search his checked bag. TFO Osuch allowed his certified narcotics detection K9, Benny, to open air sniff Savoy's carry-on bag. K9 Benny alerted to the odor of narcotics emanating from Savoy's carry-on bag.

19. TFO Brown requested consent to search Savoy's carry-on bag. Initially, Savoy was hesitant to allow the search of the carry-on bag, suggesting that there were sex items in the bag. However, after Savoy consented to the search, law enforcement did not find any sex items in the bag. Law enforcement did find $7,960.00 hidden in a pair of pants. Law enforcement also located marijuana shake and dryer sheets in the checked bag. At this point, Savoy, contradicting his prior statement, indicated the sex items were in his checked bag.

20. When asked about his purpose for traveling to Charlotte, Savoy told law enforcement that he had come to attend a court date on his 2019 conviction for Possession with Intent to Sell/Deliver Marijuana. After further investigation, law enforcement determined that Savoy did not have a court date in Charlotte and that Savoy's probation officer was unaware of Savoy's multiple trips between California and North Carolina while on probation.

21. When questioned about where he obtained the Currency, Savoy stated that he won the money gambling at the Two Kings Casino in Catawba, NC ("the Casino"). When asked for proof from the casino of this winnings, Savoy was not able to provide any documentation to corroborate his story and stated he won several small bets. Further, a subsequent inquiry by law enforcement to the Casino resulted in the Casino advising that Savoy did not have a players account at the Casino, nor did the Casino have record of cash transactions by Savoy at the Casino.

22. When asked how he traveled from Charlotte to the Casino, Savoy indicated he traveled by Uber. However, Savoy could not provide an Uber receipt or image of the Uber application on his phone, instead advising that his Uber account was closed due to issues with payments and that his friend Robert Moore had arranged the Uber ride. Savoy then provided TFO Steve Brown with a phone number for Mr. Moore. However, when TFO Brown attempted to contact Mr. Moore at the provided number, the number was disconnected.

23. Savoy also claimed that some of the Currency came from his Wells Fargo bank account and his CashApp account. Savoy showed TFO Brown a $105.00 CashApp transaction on his cell phone but did not otherwise provide any documentation for an amount anywhere close to the $7,960.00 with which Savoy was travelling.

24. Savoy further claimed that he planned to transport the Currency back to California before depositing it in his bank account. However, given the numerous Wells Fargo locations in

Charlotte (the East Coast hub for Wells Fargo), Savoy could have easily deposited the money into his bank account before leaving Charlotte. If his Wells Fargo account was truly the Currency's intended destination, this would have been a much safer option than traveling with such a large amount of cash.

25. Based on probable cause, law enforcement seized the Currency.

*The second K-9 alert and additional investigation of the Currency*

26. Thereafter, law enforcement transported the Currency to the HSI office at the airport.

27. Law enforcement then placed the Currency in a "blind lineup" consisting of different boxes. TFO Johnson then presented the lineup to K9 Gunner, the third certified and trained K9 to examine one of Savoy's items that day. K9 Gunner alerted to a box which contained the Currency, thus indicating the presence of narcotics.

28. Law enforcement transported the Currency to Loomis, where it was counted and deposited into an account established to hold seized funds.

29. The Currency consisted of two (2) one-hundred-dollar bills and 388 twenty-dollar bills—a large number of small bills consistent with narcotics trafficking.

**FIRST CLAIM FOR RELIEF – THE $7,960.00 IN CURRENCY
(21 U.S.C § 881(a)(6))**

30. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 29 above as if fully set forth herein.

31. The $7,960.00 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds

traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## CONCLUSION AND PRAYER FOR RELIEF

32. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 28th day of February, 2023.

DENA J. KING
UNITED STATES ATTORNEY

**s/ Benjamin Bain-Creed**
Florida Bar # 0021436
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Email: benjamin.bain-creed@usdoj.gov

## VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 24 day of February, 2023.

*/s/ Daniel Leal*
Special Agent Daniel Leal
Department of Homeland Security,
Homeland Security Investigations